# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

RUDI RODRIGUEZ, individually and on
behalf of all others similarly situated,      )
                                              )
                    Plaintiff,                )
                                              )     No. 01C 8526
        v.                                    )
                                              )     JUDGE CONLON
FORD MOTOR CREDIT COMPANY,                    )
a Delaware corporation                        )     MAGISTRATE JUDGE DENLOW
                                              )
                    Defendant.                )     DOCKETED
                                                    NOV 07 2001

## CLASS ACTION COMPLAINT

Plaintiff, Rudi R. Rodriguez ("Plaintiff"), by and through his attorneys, on behalf of himself

and all others similarly situated, complains of Defendant Ford Motor Credit Company ("FMCC"

or the "Company") as follows:

## I. NATURE OF THE CASE

1.      Plaintiff brings this suit individually and on behalf of a nationwide class of Hispanic-

American consumers who have made one or more motor vehicle payments to FMCC pursuant to

retail installment contracts and for which FMCC paid a dealer participation fee.

2.      FMCC has implemented a specific and identifiable credit pricing system (referred

to herein as the "Finance Charge Markup" system) that violates the Equal Credit Opportunity Act

("ECOA"), 15 U.S.C. §§ 1691-1691f, in that (1) Hispanic-Americans are unlawfully charged higher

non-risk-related charges than those charged to similarly situated non-Hispanic white consumers; and

(2) Hispanic-American consumers are not provided with the required written notification disclosing

the adverse actions taken against them with respect to credit terms as compared to similarly situated

non-Hispanic white persons.

3.      Plaintiff also brings this action under 42 U.S.C. §§ 1981 and 1982 ("Section 1981" and "Section 1982") based on Defendant's continuing deprivation of rights afforded to the named Plaintiff and members of a class of Hispanic-Americans (as defined herein in paragraph 47), by intentionally denying them the right to acquire and enforce contracts and to purchase personal property in the same manner afforded to and enjoyed by non-Hispanic white citizens.

4.      As evidence of Defendant's unlawful discrimination, Plaintiff alleges the following specific examples of disparate treatment:

(a)      **Fraudulent Concealment.**  Despite the obvious materiality of the Finance Charge Markup system to Hispanic-American consumers shopping for vehicle financing, none of the FMCC documents or disclosures to borrowers disclose the "Buy Rate" or the existence of a "Finance Charge Markup."  In fact, FMCC directs the dealerships to maintain this practice in secret and instructs and/or permits dealers to use documents provided by FMCC and oral language to imply that the interest rate quoted to the members of the Class is the required FMCC rate (i.e., the actual Buy Rate), when in fact it is not.  Because of FMCC's deception and concealment, FMCC's Hispanic-American customers have no way of knowing that they have been charged a markup significantly greater than the average markup charged to similarly situated non-Hispanic white persons during the relevant time period.

(b)      **Failure to Monitor or Remedy Discrimination.**  Despite having knowledge of the unfair and discriminatory impact of a commission-driven pricing system, FMCC has continued to use its Finance Charge Markup policy and has repeatedly failed to sufficiently monitor or prevent the discriminatory effect of the

-2-

policy. Although various industry-recognized mechanisms are available to FMCC to monitor its credit pricing policy to determine if it has a discriminatory impact on Hispanic-American credit customers, FMCC has evidently chosen not to evaluate its credit pricing policy or has evaluated it and acted with reckless indifference by choosing to ignore and conceal its discriminatory impact.

(c) **Failure to Provide Adequate Training.** FMCC financially rewards its authorized dealers who impose a Finance Charge Markup on FMCC customers. The Finance Charge Markup financially benefits both FMCC and the dealer. However, FMCC does not provide adequate ECOA training to dealers to ensure that Hispanic-American consumers are not treated in an unfair and discriminatory manner.

5.     As a result of FMCC's wrongful conduct, Plaintiff and the Class have sustained damages. Plaintiff and the Class seek compensatory and punitive damages, declaratory and injunctive relief, disgorgement and restitution of monies unlawfully obtained by FMCC from its Hispanic-American customers.

## II. JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal law.

7.     Venue for this action properly lies in this District pursuant to 28 U.S.C. §1391(b) inasmuch as the unlawful discriminatory practice is alleged to have been committed in this District, and Defendant transacts and does significant business in this District.

## III. PARTIES

8.     Plaintiff Rudi R. Rodriguez is a Hispanic-American residing in Chicago, Illinois.

-3-

Plaintiff received financing from FMCC in connection with his purchase of an automobile in Chicago, Illinois.

9.     FMCC is a corporation with its principal place of business at One American Road, Dearborn, Michigan 48121, and is organized and existing under the laws of the State of Delaware. As the largest automotive finance company in the world, FMCC has 10 million customers in 36 countries and engages in the business of financing the purchases of vehicles by consumers in all 50 states. FMCC focuses its financing efforts on consumers who exhibit a favorable credit profile and only provides sub-prime lending to consumers "who are facing credit challenges" through its wholly-owned subsidiary Fairlane Credit.

## IV.   ALLEGATIONS OF CLASSWIDE DISCRIMINATION

### A.   THE IMPACT OF THE FINANCE CHARGE MARKUP SYSTEM ON THE HISPANIC-AMERICAN COMMUNITY

10.     Hispanic-Americans are an extremely significant market for the automobile industry, representing 12% of the United States population. In 1999, Hispanic-Americans possessed approximately $383 billion in disposable income and spent approximately $74.7 billion on transportation.

11.     Yet despite their significance, or perhaps because of their significance, Hispanic Americans are being preyed upon and overcharged for their automobile loans.   Many Hispanic Americans are easy targets for these predatory lending practices because of the language barriers that exist.  For example, according to the 1990 Census, seven percent of the population in the United States spoke Spanish in their homes. Of that number, almost one-third of the persons who spoke Spanish in their homes reported that they did not speak English well. Likewise, according to the National Council of La Raza, it was estimated that half of the Hispanic adults in America are

-4-

functionally illiterate in English. Thus, as one law professor at the Washington College of Law of The American University stated: "The Spanish-Only Consumer has become a victim of choice for unscrupulous merchants in America."

12.     Overcharging Hispanic-Americans for automobile loans has a devastating effect not only on individual consumers but also on the entire Hispanic-American community. For example, if Hispanic-Americans pay $500 more per automobile than non-Hispanic whites, then Hispanic-Americans annually pay hundreds of millions more than they would if they were non-Hispanic white persons. Millions of dollars are thus being diverted from important areas such as education, housing, childcare, technology, and healthcare.

13.     The importance of FMCC's diversion of assets away from these areas to the welfare of the Hispanic-American community is demonstrated upon a brief comparison of government census data:

- Education. Just 57 percent of the Hispanic population age 25 and older has graduated from high school whereas 88.4 percent of non-Hispanic whites have a high school degree. Likewise, more than 25 percent of Hispanics had less than a ninth-grade education compared with just 4.2 percent of non-Hispanic whites.

- Homeownership. Only 4 in 10 metro Hispanic householders (as defined by the Census Bureau) owned their home as opposed to 2 in 3 metro non-Hispanic white householders. Moreover, within metro areas, Hispanic households were more likely to be crowded (defined by the Census Bureau as more than one person per room) than non-Hispanic white households (28 percent versus 2 percent).

- Health Insurance. While just 12 percent of non-Hispanic white persons were uninsured, 34.2 percent of Hispanics did not have health insurance in 1997.

14.     Moreover, the disparity that exists between the median household income of non-Hispanic whites and Hispanic-Americans further demonstrates the significance that defendant's

diversion of assets presents. According to the Statistical Abstract of the United States (2000) published by the U.S. Census Bureau, the median income (in current dollars) for the year 2000 for non-Hispanic white households was $45,904, while for Hispanic-American households, the median income dropped to $33,447. Moreover, in 1998, 22.8 percent of Hispanics were living in poverty, compared with just 7.7 percent of non-Hispanic whites.

15.     The practice of charging Hispanic-American consumers higher rates for automobile loans, along with other forms of discrimination, has undoubtedly helped to create, maintain, and intensify the wealth gap described in the paragraphs above. This wealth gap will never close unless and until discriminatory practices such as FMCC's Finance Charge Markup system are abolished.

## B. FMCC ENGAGES IN A DECEPTIVE SCHEME THAT HAS A DISCRIMINATORY EFFECT ON HISPANIC-AMERICAN CONSUMERS.

16.     FMCC is and has been engaged in a scheme to defraud, deceive and discriminate by inducing automobile dealers to cause Hispanic-American consumers who finance automobiles to pay charges that are unrelated to the consumers' credit risks but which are disguised as risk-based finance charges.

17.     The charges that are imposed on Hispanic-American consumers have nothing to do with these consumers' credit histories, earnings, debt obligations, employment history, model of the vehicle being purchased, price of the vehicle being purchased, age of the vehicle being purchased, amount of the down payment, trade-in vehicle or any other risk-based factor.

18.     FMCC is and has been secretly inducing and paying automobile dealers to deceive their customers into paying automobile loans at interest rates inflated well above the risk-related interest rates required by FMCC. This Finance Charge Markup system, through which the dealer receives a kickback of profits from the artificially high rate of interest, is, in fact, a predatory

pricing scheme which has resulted and continues to result in unlawful racial discrimination against Hispanic-Americans.

19.     Although facially neutral, the mark-up policy has a disproportionately adverse effect on Hispanic-Americans compared to similarly situated non-Hispanic whites. In fact, statistical analyses of markups imposed on minorities by other automotive finance companies that use similar credit pricing schemes have revealed that minorities, after controlling for credit risk, are substantially more likely than similarly situated whites to receive markups and pay hundreds of dollars more in markup charges.

20.     FMCC has a non-delegable duty to ensure that its motor vehicle financing structure and policies do not have a disparate impact on legally protected classes, such as Hispanic-Americans. Despite having such a non-delegable duty, FMCC has chosen to use and, on information and belief, continues to use a Finance Charge Markup policy that it knows or should know has a significantly adverse and pervasive impact on Hispanic-American borrowers. FMCC, however, fails to take adequate actions to monitor or prevent the discriminatory effect of the system and does not provide adequate ECOA training to dealers to ensure that Hispanic-American borrowers are treated in a fair and nondiscriminatory manner.

21.     The disparities between the terms of the FMCC transactions involving Hispanic-Americans and those involving non-Hispanic white borrowers cannot be a product of chance and cannot be explained by factors unrelated to race. Instead, the disparities are the direct causal result of the use of the discriminatory Finance Charge Markup policy.

22.     FMCC's Finance Charge Markup system involves several components, including: a) nation-wide marketing of FMCC as a company which provides the consumer with fair and competitive credit based on the consumer's credit history; b) secret financial incentives to dealers

to impose non-risk related charges disguised as finance charges without informing the consumer; c) an agreement between FMCC and the dealers to exchange information to effect the scheme and to do so without disclosure to the consumer; and d) an agreement by FMCC to educate the dealers and their employees in the most effective method for deceiving their customers. The disparate impact suffered by Hispanic-Americans is a direct result of FMCC's pricing policy in that FMCC designed, directed, disseminated, controlled, implemented and profited from the mark-up policy creating the disparate impact.

23. FMCC creates a public image that purchasers of vehicles can obtain "FMCC financing" at competitive rates quoted by FMCC. Through dealer manuals and other policies and procedures, FMCC encourages and gives incentives to dealers to inflate the approved or required interest rates and, through misleading documentation, induces consumers to believe the inflated rate is the rate at which they were approved by FMCC, and induces Hispanic-Americans to believe the inflated rate is the same rate which would be given to a similarly situated non-Hispanic white person.

24. On a monthly basis, FMCC quotes rates to dealers at which it will provide financing (the "Buy Rate"). Buy Rates are generally based on several factors including the age of the car and the term of the receivable. For example, on at least a monthly basis, FMCC may publish and distribute to its dealers an approved Buy Rate of 8%. This informs the dealers that FMCC will finance a vehicle for persons approved for credit at 8%. However, FMCC also induces and encourages dealers to charge rates greater than the Buy Rate, but deceive consumers into believing that they have received the BuyRate, and deceive Hispanic-Americans into believing they have received the same rate as a similarly situated non-Hispanic white consumer.

25. FMCC induces dealers to quote contract interest rates to customers at an inflated rate

-8-

over the Buy Rate. This difference represents compensation to the dealership in the form of a Dealer Premium and is paid by FMCC in addition to the amount financed. The Dealer Premium is paid to the dealer each month for all finance contracts executed by the dealer during the preceding month. Thus, FMCC systematically gives incentives to dealers to unlawfully discriminate among persons with equal credit worthiness.

26. Despite the obvious materiality of the Finance Charge Markup system and its disparate impact on Hispanic-American consumers, none of the documents used by FMCC disclose its features. In fact, FMCC has directed the dealerships to maintain this practice in secret so as to insure its continued viability. Moreover, FMCC instructs and/or permits dealers to use documents and oral language to imply that the interest rate quoted to the members of the Class is the required FMCC rate (i.e., the actual Buy Rate), when in fact, it is not.

27. In sum, FMCC directs, controls and/or influences every aspect of the dealer-based finance program by:

> (1) requiring and providing specific FMCC forms to be used and training dealers to complete the FMCC required finance forms;
>
> (2) evaluating the credit worthiness of each customer and assigning each to a credit risk tier;
>
> (3) establishing the Buy Rate for each loan transaction based on the risk-based "tier" assignment;
>
> (4) providing a financial incentive for the dealership to add non-risk charges (i.e., Finance Charge Markup) to the risk-based "tier" charge which rewards both the dealer and FMCC;
>
> (5) establishing the maximum markup rate for each finance transaction;

(6)     training dealers regarding "basic selling techniques"; and

(7)     establishing how the Finance Charge Markup will be divided between the dealer and FMCC.

28.     FMCC took adverse action upon Plaintiff's (and the class members') applications for credit when it declined to provide him (and them) with credit on terms extended to similarly situated non-Hispanic white persons. However, FMCC failed to notify Plaintiff (or the class members) within thirty days of its adverse action, and to date has never notified Plaintiff (or the class members) of its adverse action.

## C.    FMCC IS FULLY AWARE OF ECOA AND YET WILLFULLY FAILS TO COMPLY.

29.     The financial industry, including FMCC, has been on notice for years that commission-driven pricing systems, like the Finance Charge Markup system utilized by FMCC, produce significant discriminatory effects.

30.     Unlike the real estate mortgage industry, which is required by federal law to record race information, the automobile financing industry exploits its exemption from recording race information for ECOA compliance monitoring purposes and feigns ignorance of the discriminatory impact of its discretionary pricing systems.

31.     The discriminatory effect of a commission-driven pricing system has been widely known throughout the financing and banking industry as a result of legal proceedings by the U.S. Department of Justice involving similar commission-driven pricing systems in the real estate mortgage industry, including, for example:

> United States v. First National Bank of Vicksburg, No. 5:94 CV 6(B)(N) (S.D. Miss. January 21, 1994) (charging African-Americans higher interest rates);

> United States v. Huntington Mortgage Co., No. 1; 95 CV 2211 (N.D. Ohio October

18, 1995) (charging African-Americans higher fees);

United States v. Security State Bank of Pecos, No. SA 95 CA 0996 (W.D. Tex. October 15, 1995) (charging Hispanic-Americans higher interest rates);

United States v. Long Beach Mortgage Co., No. CV-96-6159 (C.D. Cal. Sept. 5, 1996) (charging African-Americans, Hispanic-Americans, women, and persons over age 55 higher interest rates).

32.     Further, the discriminatory effect of a commission-driven pricing system has been widely known throughout the financing and banking industry as a result of a plethora of articles in trade journals following certain U.S. Department of Justice legal proceedings, including, for example:

Two Banks To Pay Damages Following Justice Probes Into Lending Discrimination, Department of Justice Press Release 94-027 (Jan. 21, 1994);

Jaret Seiberg, Industry Sees Dangerous Extension Of Bias for Discrimination Complaints, Am. Banker, Aug. 23, 1994, at 4;

Chicago Area Lender Agrees with Justice Department to Settle Lending Discrimination Claims, Department of Justice Press Release 95-306 (June 1, 1995);

Justin Fox, Northern Trust Settles U.S. Suit by Agreeing to Pay Minorities, Am. Banker, June 2, 1995, at 2;

Ohio Mortgage Company Agrees to Compensate African Americans Charged Higher Prices for Home Mortgages than Non-Hispanic whites, Department of Justice Press Release 95-540 (October 18, 1995);

Texas Banks to Pay $500,000 for Charging Hispanic Borrowers Higher Interest Rates than Equally Qualified Non-Hispanics, Department of Justice Press Release 95-541 (Oct. 18, 1995);

Fleet Subsidiary To Pay $4 Million to Settle Claims that Blacks and Hispanics Were Charged Higher Loan Prices than Non-Hispanic whites, Department of Justice Press Release 96-211 (May 7, 1996);

Long Beach Lender to Pay $3 Million for Allegedly Charging Higher Rates to African Americans, Hispanics, Women and the Elderly, Department of Justice Press Release 96-429 (Sept. 5, 1996).

### D. FMCC'S FAILURE TO MONITOR OR REMEDY DISCRIMINATION AGAINST AFRICAN-AMERICAN BORROWERS AND FAILURE TO PROVIDE ADEQUATE DEALER TRAINING

33.     Despite clear and unequivocal notice and knowledge of the unfair and discriminatory impact of a commission-driven pricing system, FMCC has continued its Finance Charge Markup policy and has done little, if anything, to monitor or prevent the discriminatory effect of this policy.

34.     There are various industry-recognized mechanisms available to FMCC to monitor its credit pricing policy to determine if it has a discriminatory impact on Hispanic-American credit customers.  FMCC's continued use of a credit pricing policy that is known to result in significant racial disparities indicates that FMCC has intentionally chosen not to evaluate its credit pricing policy or has evaluated it and acted with reckless indifference by choosing to ignore and conceal its discriminatory impact.

35.     Further, while FMCC induces its dealers to impose a finance charge markup on FMCC customers, which financially benefits both FMCC and the dealer, it provides inadequate ECOA training to its dealers to ensure that Hispanic-American borrowers are not treated in an unfair and discriminatory manner.

### E. FMCC FURTHERS ITS SCHEME TO DEFRAUD PLAINTIFF AND THE CLASS MEMBERS.

36.     On or about December 30, 1999, in the City of Chicago, State of Illinois, Plaintiff purchased a new 1999 Ford Escort from Bert Weinman Ford, Inc. FMCC financed the purchase.

37.     Upon information and belief, Bert Weinman Ford, Inc., is an authorized FMCC dealer and an agent for FMCC.

38.     Plaintiff signed a Simple Interest Motor Vehicle Contract and Security Agreement ("Contract") to purchase the vehicle with an annual percentage rate ("APR") of 18.95%.

39.     Upon information and belief, Plaintiff was subjected to FMCC's Finance Charge Markup policy.

40.     Upon information and belief, unbeknownst to Plaintiff, the APR (18.95%) in the agreement was actually a combination of an objective, risk-based calculation (Buy Rate) and markup added pursuant to FMCC's Finance Charge Markup policy.

41.     Upon information and belief, Plaintiff was charged a disproportionately greater amount of non-risk-related credit charges than similarly situated non-Hispanic white customers.

42.     Plaintiff has not been provided with written notification disclosing the adverse action taken against him with respect to credit terms as compared to similarly situated non-Hispanic white persons.

43.     Due to defendant's acts and omissions, Plaintiff could not, with the exercise of due diligence, discover the acts constituting the violations of law described herein, including but not limited to defendant's acts devising and maintaining systems to allow Hispanic-Americans to be charged higher, non-risk based interest rates, concealing from Plaintiff the Finance Charge Markups, and misrepresenting the nature of finance charges on loan applications and loan agreements.

44.     Neither Plaintiff nor Class members had notice of any of the foregoing acts or violations. Accordingly, the doctrines of equitable tolling and/or fraudulent concealment apply to extend any applicable statutes of limitation or repose.

45.     Defendant's acts enumerated herein, constituting violations of the rights of Plaintiff and the Class under ECOA, § 1981 and § 1982, are part of a series of related acts, the common objective of which is to deprive Plaintiff and members of the Class of their rights and to earn more

money for defendant at the direct expense of Plaintiff and the Class. Furthermore, the acts enumerated herein, constituting violations of the rights of Plaintiff and the Class under ECOA, § 1981 and § 1982 are part of, and a consequence of, the maintenance of defendant's discriminatory system which has existed before, during and after the statutory limitations period applicable to Plaintiff and the members of the Class. Accordingly, under the "continuing violation" rule, the causes of action asserted herein do not accrue (for statutes of limitation purposes) until the "last asserted occurrence" of defendant's pattern of unlawful conduct. In light of defendant's continuing pattern of unlawful conduct, all of the claims of Plaintiff and the Class are timely through the time of the filing of this complaint and thereafter until the termination of defendant's unlawful conduct.

46. As a direct result of said conduct by FMCC, Plaintiff has sustained, and continues to sustain, actual damages in an amount to be determined at trial. The damages sustained by Plaintiff are similar to those suffered generally by all Hispanic-American borrowers.

## V. CLASS ACTION ALLEGATIONS

47. Plaintiff brings this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure as a class action on her own behalf and on behalf of a Class defined as:

> All Hispanic-American consumers who obtained financing from Ford Motor Credit Company pursuant to a retail installment automobile contract in the United States from January 1, 1990 to the present ("Class Period").

Excluded from the Class are defendant, any parent, subsidiary or affiliate of defendant, their officers, directors and employees who are now or were employed by defendant during the above-defined Class Period. The requirements for maintaining this action as a class action are satisfied in that:

(a)     The Class is so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number and identity of Class members are unknown by Plaintiff at this time, Plaintiff believes there are thousands of Class members. The requirement of numerosity is therefore satisfied.

(b)     There are questions of law or fact common to the Class. These questions predominate over any questions affecting only individual members, as required by Rule 23(a). Among these common questions of law or fact are:

(i)     whether FMCC violated the Equal Credit Opportunity Act ("ECOA");

(ii)    whether FMCC violated 42 U.S.C. § 1981;

(iii)   whether FMCC violated 42 U.S.C. § 1982;

(iv)    whether FMCC's "Finance Charge Markup" policy is a facially neutral credit pricing system that discriminates on the basis of race in violation of ECOA;

(v)     whether there are statistically significant disparities between the amount of the markup imposed on Hispanic-Americans and the markup imposed on non-Hispanic white persons that are not related to creditworthiness;

(vi)    whether FMCC has taken adequate actions to monitor or prevent the discriminatory effect of the system;

(vii)   whether FMCC provided adequate training to dealers to ensure that Hispanic-American consumers are not treated in an unfair and discriminatory manner;

-15-

(viii)  what is the proper measure of disgorgement in this case;

(ix)  whether Plaintiff and the Class are entitled to damages and, if so, in what amount; and

(x)  whether Plaintiff and the Class are entitled to injunctive relief, attorneys' fees, and reimbursement of costs.

(c)  The claims of the representative Plaintiff are typical of the Class. Mr. Rodriguez, a Hispanic-American, was (1) charged a markup; (2) charged a markup significantly greater than the average markup charged to similarly situated non-Hispanic white persons during the relevant time period; and (3) not provided with written notification disclosing the adverse action taken against him with respect to credit terms as compared to similarly situated non-Hispanic white persons.

(d)  Plaintiff will fairly and adequately protect the interests of the Class. The interests of the Class are congruent with, and not antagonistic to, those of Plaintiff. Furthermore, Plaintiff is represented by experienced class action counsel who will vigorously prosecute this action for the benefit of the Class.

(e)  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. There is no special interest in the members of the Class individually controlling the prosecution of separate actions; the damages sustained by individual Class members may be relatively small; and the expense and burden of individual litigation make it impossible for the Class members individually to address the wrongs done to them. There will be no difficulty in managing this lawsuit as a class action. Furthermore, FMCC transacts substantial business in this

-16-

District, and will therefore not be prejudiced or inconvenienced by the maintenance of the action in this forum.

## COUNT I
### (Discrimination in Violation of ECOA – 15 § 1691(a))

48.     Plaintiff repeats and realleges every allegation above as if set forth herein in full.

49.     FMCC is a creditor as defined in ECOA and, in the ordinary course of its business, made the decision whether or not and/or under what terms to extend credit to the Plaintiff and all prospective Class members.

50.     Plaintiff and prospective Class members are aggrieved persons as defined in ECOA, by virtue of having been subjected to FMCC's discriminatory Finance Charge Markup policy.

51.     FMCC designs, disseminates, controls, implements and profits from its Finance Charge Markup policy which discriminates against Hispanic-American credit applicants on the basis of their race and has had a disparate economic impact on Hispanic-Americans compared to similarly situated whites.

52.     All actions taken by the dealers under FMCC's Finance Charge Markup were in accordance with the specific authority granted to them by FMCC and were in furtherance of FMCC's policies and practices.

53.     As a result of FMCC's Finance Charge Markup policy, FMCC has collected disproportionately more in finance charges from Hispanic-Americans than from similarly situated non-Hispanic white persons, for reasons totally unrelated to credit risk.

54.     FMCC's Finance Charge Markup policy violates ECOA. As a result, Plaintiff and the Class have suffered damages in an amount to be determined at trial.

## COUNT II
### (Discrimination in Violation of ECOA – 15 § 1691(d))

55.     Plaintiff repeats and realleges every allegation above as if set forth herein in full.

56.     15 U.S.C. § 1691(d)(1) provides that a creditor must notify an applicant for credit, within thirty days, of its actions on the application.

57.     Pursuant to 15 U.S.C. § 1691(d)(2), an applicant against whom adverse action is taken must be provided with a written statement of reasons or written notification which discloses the right to a statement of reasons for any "adverse action" taken against him or her. Adverse action includes declining to provide credit on terms extended to similarly situated persons.

58.     FMCC took adverse action upon Plaintiff's application for credit, in that it declined to provide Plaintiff credit on terms extended to similarly situated non-Hispanic white persons.

59.     FMCC did not notify Plaintiff within thirty days of its action, and to date has never notified Plaintiff of its action.

60.     FMCC's conduct violates ECOA. As a result, Plaintiff and the Class have suffered damages in an amount to be determined at trial.

## COUNT III
### (Discrimination in Violation of Section 1981)

61.     Plaintiff repeats and realleges every allegation above as if set forth herein in full.

62.     Section 1981 provides that all persons shall have the same right to make and enforce contracts as is enjoyed by non-Hispanic white citizens.

63.     Defendant has intentionally discriminated against Plaintiff and the Class in violation of Section 1981 by implementing, sustaining, and failing to monitor a pattern and practice of charging its Hispanic-American customers markups greater than the average markup charged to similarly situated non-Hispanic white persons.

-18-

## COUNT IV
### (Discrimination in Violation of Section 1982)

64.     Plaintiff repeats and realleges every allegation above as if set forth herein in full.

65.     Section 1982 provides that all persons shall have the same right to purchase personal property as is enjoyed by non-Hispanic white citizens.

66.     Defendant has intentionally discriminated against Plaintiff and the Class in violation of Section 1982 by implementing, sustaining, and failing to monitor a pattern and practice of charging its Hispanic-American customers markups greater than the average markup charged to similarly situated non-Hispanic white persons for the purchase of automobiles.

## COUNT V
### (Injunction)

67.     Plaintiff repeats and realleges every allegation above as if set forth herein in full.

68.     Pursuant to ECOA, appropriate injunctive relief should be granted to prohibit the further use of the Finance Charge Markup policy employed by FMCC. Such injunctive relief should include:

(a)     Prohibition of non-risk-related Finance Charge Markups;

(b)     Requiring extensive ECOA training of FMCC employees;

(c)     Requiring FMCC to provide extensive ECOA training for the dealers with which it works;

(d)     Requiring FMCC to impose requirements regarding the minimum qualifications of persons engaged in offering FMCC financing to borrowers; and

(e)     Requiring FMCC to monitor and/or audit the racial pattern of its Finance Charge Markup policy to ensure the discriminatory impact of

the system ends.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in their favor and against FMCC as follows:

(a)     Certify this case as a class action and certify the named Plaintiff herein to be an adequate class representative and his counsel to be class counsel;

(b)     Enter a judgment, pursuant to 15 U.S.C. § 1691e(c), declaring the acts and practices of Defendant complained of herein to be in violation of ECOA;

(c)     Enter a judgment, pursuant to 42 U.S.C. § 1981 and 1982 against Defendant;

(d)     Grant a permanent injunction, pursuant to 15 U.S.C. § 1691e(c) and 42 U.S.C. § § 1981 and 1982 , enjoining FMCC from continuing to discriminate against Plaintiff and the members of the Class because of their race through further use of the Finance Charge Markup policy or any other non-risk-related markup policy employed by FMCC;

(e)     Order FMCC, pursuant to 15 U.S.C. § 1691e(c), to adopt and enforce a policy that requires ECOA training of FMCC employees and the dealers with which it works;

(f)     Order FMCC, pursuant to 15 U.S.C. § 1691e(c), to monitor and/or audit the racial pattern of its financing to ensure the cessation of discriminatory effects in its vehicle financing;

(g)     Order disgorgement, pursuant to 15 U.S.C. § 1691e(c), of all disproportionate non-risk charges imposed on Hispanic-Americans by FMCC's Finance Charge Markup policy; and order the equitable distribution of such charges, as restitutionary relief, to all Class members;

(h)     Award Plaintiff and the Class compensatory and punitive damages to the extent permitted by law;

(i)     Award Plaintiff the costs of this action, including the fees and costs of experts,

together with reasonable attorneys' fees, pursuant to 15 U.S.C. §1691e(d); and

(j)     Grant Plaintiff and the Class such other and further relief as this Court finds necessary and proper.


## JURY DEMAND

Plaintiff demands trial by jury on all claims so triable.


DATED: November 6, 2001                          RUDI R. RODRIGUEZ, individually and on
                                                 behalf of all others similarly situated, Plaintiff



                                                 By: _____
                                                           One of His Attorneys



Kenneth A. Wexler
Elizabeth Fegan Hartweg
KENNETH A. WEXLER AND ASSOCIATES
One North LaSalle Street
Suite 2000
Chicago, Illinois 60602
(312) 346-2222


Cyrus Mehri                              Daniel E. Gustafson
Steven A. Skalet                         HEINS MILLS & OLSON
Jeffery A. Whitney                       700 Northstar East
MEHRI & SKALET, PLLC                     608 Second Avenue South
2120 L Street, NW                        Minneapolis, MN 55402
Suite 400                                (612) 338-4605
Washington, D.C. 20037
(202) 822-5100


-21-

Marc H. Edelson
HOFFMAN & EDELSON, LLC
45 West Court Street
Doylestown, PA 18901
(215) 230-8043

Ira Richards
RODRIGUEZ & RICHARDS
226 West Ritten House Square
Floor 32
Philadelphia, PA 19103
(215) 721-9004

Anthony Bolognese
BOLOGNESE & ASSOCIATES
One Penn Center
1617 JFK Boulevard
Suite 650
Philadelphia, PA 19103
(215) 814-6750

Lee Squitieri
SQUITIERI & FEARON, LLP
521 Fifth Avenue
26th Floor
New York, NY 10175
(646) 487-3049

Jonathan Shub
SHELLER, LUDWIG & BADEY, P.C.
1528 Walnut Street
3rd Floor
Philadelphia, PA 19102
(215) 790-7327

Civil Cover Sheet                                                                      Page 1 of 2



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS



DOCKET
NOV 0 7 2001

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

---

**Plaintiff(s):** RUDI RODRIGUEZ

County of Residence: Cook County, Illinois

Plaintiff's Atty:    Kenneth A. Wexler
                     Kenneth A. Wexler and
                     Associates
                     One North LaSalle St., Suite
                     2000
                     (312) 346-2222

**Defendant(s):** FORD MOTOR CREDIT COMPANY

County of Residence: Wayne County, Michigan

Defendant's Atty:

Unknown

**01C 8526**

---

II. Basis of Jurisdiction:    **3. Federal Question (U.S. not a party)**    JUDGE CONLON

III. Citizenship of Principle
Parties (Diversity Cases Only)         MAGISTRATE JUDGE DENLOW
          Plaintiff:- N/A
          Defendant:- N/A

IV. Origin :    **1. Original Proceeding**

V. Nature of Suit:    **440 Other Civil Rights**

VI. Cause of Action:    **Equal Credit Opportunity Act, 15 U.S.C. 1691, and 42 U.S.C. 1981, 1982**

VII. Requested in Complaint
          Class Action: **Yes**
          Dollar Demand:
          Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

**Signature:**

**Date:** November 6, 2001

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

In the Matter of

RUDI RODRIGUEZ, individually and on behalf of all
others similarly situated,

v.

FORD MOTOR CREDIT COMPANY, a Delaware
corporation.

Case Number: 01C 8526

DOCKETED
NOV 0 7 2001

JUDGE CONLON

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff Rudi Rodriguez

MAGISTRATE JUDGE DENLOW

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Kenneth A. Wexler | NAME Elizabeth Fegan Hartweg |
| FIRM KENNETH A. WEXLER AND ASSOCIATES | FIRM KENNETH A. WEXLER AND ASSOCIATES |
| STREET ADDRESS One North LaSalle Street, Suite 2000 | STREET ADDRESS One North LaSalle Street, Suite 2000 |
| CITY/STATE/ZIP Chicago, IL 60602 | CITY/STATE/ZIP Chicago, IL 60602 |
| TELEPHONE NUMBER (312) 346-2222 | TELEPHONE NUMBER (312) 346-2222 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 03127810 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06229226 |
| MEMBER OF TRIAL BAR? YES ✓ NO | MEMBER OF TRIAL BAR? YES NO ✓ |
| TRIAL ATTORNEY? YES ✓ NO | TRIAL ATTORNEY? YES ✓ NO |
| | DESIGNATED AS LOCAL COUNSEL? YES ✓ NO |

| (C) | (D) |
|---|---|
| SIGNATURE Cyrus Mehri / KAW | SIGNATURE Daniel E. Gustafson / KAW |
| NAME Cyrus Mehri | NAME Daniel E. Gustafson |
| FIRM MEHRI & SKALET, PLLC | FIRM HEINS MILLS & OLSON |
| STREET ADDRESS 2120 L Street, NW, Suite 400 | STREET ADDRESS 700 Northstar East, 608 2nd Avenue South |
| CITY/STATE/ZIP Washington, D.C. 20037 | CITY/STATE/ZIP Minneapolis, MN 55402 |
| TELEPHONE NUMBER (202) 822-5100 | TELEPHONE NUMBER (612) 338-4605 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES NO ✓ | MEMBER OF TRIAL BAR? YES NO ✓ |
| TRIAL ATTORNEY? YES ✓ NO | TRIAL ATTORNEY? YES ✓ NO |
| DESIGNATED AS LOCAL COUNSEL? YES NO ✓ | DESIGNATED AS LOCAL COUNSEL? YES NO ✓ |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

**DOCKETED**
NOV 07 2001

In the Matter of

RUDI RODRIGUEZ, individually and on behalf of all
others similarly situated,
    v.

FORD MOTOR CREDIT COMPANY, a Delaware
corporation.

Case Number: 01C 8526

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

JUDGE CONLON

Plaintiff Rudi Rodriguez

MAGISTRATE JUDGE DENLOW

| (A) | (B) |
|---|---|
| SIGNATURE _Marc H. Edelson/KAW_ | SIGNATURE _Lee Squitieri/KAW_ |
| NAME<br>Marc H. Edelson | NAME<br>Lee Squitieri |
| FIRM<br>HOFFMAN & EDELSON, LLC | FIRM<br>SQUITIERI & FEARON, LLP |
| STREET ADDRESS<br>45 West Court Street | STREET ADDRESS<br>521 Fifth Avenue, 26th Floor |
| CITY/STATE/ZIP<br>Doylestown, PA 18901 | CITY/STATE/ZIP<br>New York, NY 10175 |
| TELEPHONE NUMBER<br>(215) 230-8043 | TELEPHONE NUMBER<br>(646) 487-3049 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☑ | MEMBER OF TRIAL BAR?   YES ☐   NO ☑ |
| TRIAL ATTORNEY?   YES ☑   NO ☐ | TRIAL ATTORNEY?   YES ☑   NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☑ |
| **(C)** | **(D)** |
| SIGNATURE _Jeffrey A. Whitney/KAW_ | SIGNATURE _Ira Richards/KAW_ |
| NAME<br>Jeffrey A. Whitney | NAME<br>Ira Richards |
| FIRM<br>MEHRI & SKALET, PLLC | FIRM<br>RODRIGUEZ & RICHARDS |
| STREET ADDRESS<br>2120 L Street, NW, Suite 400 | STREET ADDRESS<br>226 West Ritten House Square, Floor 32 |
| CITY/STATE/ZIP<br>Washington, D.C. 20037 | CITY/STATE/ZIP<br>Philadelphia, PA 19103 |
| TELEPHONE NUMBER<br>(202) 822-5100 | TELEPHONE NUMBER<br>(215) 721-9004 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☑ | MEMBER OF TRIAL BAR?   YES ☐   NO ☑ |
| TRIAL ATTORNEY?   YES ☑   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☑ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☑ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☑ |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

**DOCKETED**

NOV 0 7 2001

In the Matter of

RUDI RODRIGUEZ, individually and on behalf of all
others similarly situated,

    v.

FORD MOTOR CREDIT COMPANY, a Delaware
corporation.

Case Number: 01C 8526

JUDGE CONLON

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiff Rudi Rodriguez

MAGISTRATE JUDGE DENLOW

| (A) | (B) |
|---|---|
| SIGNATURE *Jonathan Shub /KAW* | SIGNATURE *Anthony Bolognese /KAW* |
| NAME Jonathan Shub | NAME Anthony Bolognese |
| FIRM SHELLER, LUDWIG & BADEY, P.C. | FIRM BOLOGNESE & ASSOCIATES |
| STREET ADDRESS 1528 Walnut Street, 3rd Floor | STREET ADDRESS One Penn Center, 1617 JFK Boulevard, Suite 650 |
| CITY/STATE/ZIP Philadelphia, PA 19102 | CITY/STATE/ZIP Philadelphia, PA 19103 |
| TELEPHONE NUMBER (215) 790-7327 | TELEPHONE NUMBER (215) 814-6750 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?  YES [ ]  NO [✓] | MEMBER OF TRIAL BAR?  YES [ ]  NO [✓] |
| TRIAL ATTORNEY?  YES [ ]  NO [✓] | TRIAL ATTORNEY?  YES [ ]  NO [✓] |
|  | DESIGNATED AS LOCAL COUNSEL?  YES [ ]  NO [✓] |

| (C) | (D) |
|---|---|
| SIGNATURE *Steven A. Skalet /KAW* | SIGNATURE |
| NAME Steven A. Skalet | NAME |
| FIRM MEHRI & SKALET, PLLC | FIRM |
| STREET ADDRESS 2120 L Street, NW, Suite 400 | STREET ADDRESS |
| CITY/STATE/ZIP Washington, D.C. 20037 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (202) 822-5100 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?  YES [ ]  NO [✓] | MEMBER OF TRIAL BAR?  YES [ ]  NO [✓] |
| TRIAL ATTORNEY?  YES [ ]  NO [✓] | TRIAL ATTORNEY?  YES [ ]  NO [✓] |
| DESIGNATED AS LOCAL COUNSEL?  YES [ ]  NO [✓] | DESIGNATED AS LOCAL COUNSEL?  YES [ ]  NO [✓] |

